IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

ROGUE ADVOCATES, an Oregon
nonprofit membership corporation,

        Plaintiff,

        v.

MOUNTAIN VIEW PAVING, INC., an
Oregon corporation,

        Defendant.

Case No. 1:15-cv-01854-CL

ORDER

_____

CLARKE, Magistrate Judge

        Plaintiff Rogue Advocates brings this citizen suit against Defendant Mountain View
Paving, Inc., under Section 304 of the Clean Air Act ("CAA"), 42 U.S.C. § 7604. Plaintiff
alleges Defendant's operation of an asphalt batch plant, as well as associated activities, on its
property violated its federally enforceable air quality permit, resulting in repeated violations of

the CAA from 2010 to the present. Plaintiff seeks declaratory relief, injunctive relief, civil penalties, and attorney fees and costs associated with bringing this action. This case comes before the Court on Defendant's motion for summary judgment (#82) and Plaintiff's cross-motion for partial summary judgment (#89). For the reasons below, Defendant's motion is GRANTED in part and DENIED in part and Plaintiff's motion is DENIED.[1]

## FACTUAL BACKGROUND

In 2001, Defendant began operating an asphalt batch plant on land it purchased from Howard DeYoung, the former owner, who had purchased the land in 1963. Def.'s Mot. for Summ. J. Ex. 2, at 4 [ECF No. 82.]. The land is located in Jackson County, Oregon. Def.'s Mot. for Summ. J. Ex. 1, at 1. Prior to Defendant's purchase, DeYoung engaged in an aggregate mining operation and leased the land to various companies, who, from 1963 to 2000, operated a concrete batch plant on the property. Def.'s Mot. for Summ. J. Ex. 2, at 4. At the time the first batch plant was installed, the property was not subject to zoning or land use regulations, making use of a batch plant permissible. Def.'s Mot. for Summ. J. Ex. 3, at 2. It was not until 1973 that the land first became subject to zoning restrictions, which placed limitations on land use. Def.'s Mot. for Summ. J. Ex. 2, at 4. Neither the initial 1973 zoning restrictions nor the current zoning restrictions allow the use of batch plants on the property. Def.'s Mot. for Summ. J. Ex. 3, at 2. Jackson County Land Development Ordinance ("LDO") does, however, provide that a use lawfully established prior to a contrary zoning restriction may be continued after enactment of the restriction. Def.'s Mot. for Summ. J. Ex. 2, at 6. The LDO terms this a "nonconforming use." Def.'s Mot. for Summ. J. Ex. 3, at 2.

When Defendant purchased the property in 2001, DeYoung continued to lawfully operate a concrete batch plant on the property as a nonconforming use. Def.'s Mot. for Summ. J. Ex. 2,

---

[1] The parties have consented to Magistrate Judge jurisdiction over this action pursuant to 28 U.S.C. § 636(c)(1).

at 3, 8. Upon purchase, Defendant replaced the concrete batch plant with an asphalt batch plant and crusher. Def.'s Mot. for Summ. J. Ex. 2, at 4. In operating the asphalt batch plant, Defendant would have raw material delivered to the site. Def.'s Mot. for Summ. J. Ex. 2, at 5. The raw material was stored in stock piles, eventually "refined through the crusher, mixed with asphalt in the batch plant, [with] the resulting product [] transported off-site for paving projects." Def.'s Mot. for Summ. J. Ex. 2, at 5. During operation, the batch plant released various contaminants, including carbon monoxide, sulfur dioxide, and nitrogen oxides. Pl.'s Mot. for Prelim. Inj. Ex. 6-1, at 37. Because it released such contaminants, Defendant was required to obtain an Air Contaminant Discharge Permit ("ACD permit") from the Oregon Department of Environmental Quality ("DEQ"). Def.'s Mot. for Summ. J. Ex. 4, at 2-3; Or. Admin. R. ("OAR") § 340-216-0020(3). Defendant "consistently reported both the volume of asphalt production and the Plant's discharge of pollutants to DEQ. . . ." Def.'s Mot. for Summ. J. Ex. 4, at 3.

Sometime in the 1980s, Mountain View Estates, an age-restricted residential retirement community, was built adjacent to the property. Hudson Decl. ¶ 4 [ECF No. 11.]. Beginning in 2011, Defendant increased operations on the land, and Plaintiff, acting with its members at Mountain View Estates, as well as other nearby residents, lodged "code complaints" with Jackson County (the "County"), asserting Defendant's batching operation burdened the nearby property owners with significant noise and odor and violated local zoning ordinances. Hudson Decl. ¶¶ 8-10; Rouse Decl. ¶ 6 [ECF No. 10.]. The complaints resulted in "code enforcement hearings"; however, "nothing came out of that process other than a minimal fine," as "the County [] never required [Defendant] to stop its operations." Hudson Decl. ¶ 10. Indeed, a 2012 DEQ e-mail stated that, "as the County views it currently, the facility is allowed to operate and be placed at its current site," and "until [DEQ] hears otherwise, the County has determined that

the land-use, for this plant to operate at this location, is currently allowed." Def.'s Mot. for Summ. J. Ex. 7.

Due to the ongoing disputes, however, in September 2012, Defendant filed an application with the Jackson County Planning Division Staff ("Planning Division") seeking verification that its asphalt batch plant was a lawfully established nonconforming use. Def.'s Mot. for Summ. J. Ex. 3, at 2. On the same day, Defendant filed an application with the Planning Division for approval of a floodplain development permit; a significant portion of Defendant's property is located in the regulatory floodway of Bear Creek, a major Rogue River tributary, and Defendant did not hold a floodplain development permit, as required by LDO 7.2.2(C). Def.'s Mot. for Summ. J. Ex. 3, at 2; Pl.'s Mot. for Prelim. Inj. Ex. 6-5, at 2. On March 25, 2013, the Planning Division issued a decision approving both applications. Def.'s Mot. for Summ. J. Ex 3, at 2-3. Plaintiff timely appealed the Planning Division's decision to a County hearings officer. Def.'s Mot. for Summ. J. Ex. 3, at 3. On September 26, 2013, the hearings officer found that the asphalt batch plant constituted a lawful nonconforming use, as the prior concrete batch plant and the then-current asphalt batch plant were effectively equivalent, and thus the conversion to the asphalt batch plant did not require County approval. Def.'s Mot. for Summ. J. Ex. 3, at 3. The hearings officers denied the requested nonconforming use verification, however, finding that a "shop structure," as well as other structures added to the property after 2001, "were unauthorized expansions of the nonconforming use" and Defendant had not sought County approval for these expansions. Def.'s Mot. for Summ. J. Ex. 3, at 3. The hearings officer also vacated the floodplain development permit due to the finding that there were unauthorized expansions of the nonconforming use. Pl.'s Mot. for Prelim. Inj. Ex. 6-5, at 3.

Page 4 – ORDER

Following the hearings officer's decision, the County cited Defendant for violating floodplain and building permit ordinances. Def.'s Mot. for Summ. J. Ex. 10. Thereafter, Defendant and the County entered into a stipulated order, whereby the County permitted Defendant "to continue to engage in nonconforming uses while [it] proceed[ed] through the County's land use process." Def.'s Mot. for Summ. J. Ex. 11, at 2; *see also* Def.'s Mot. for Summ. J. Ex. 10. Additionally, Defendant applied for, and the County granted, a new floodplain permit, which authorized the "operation of the limited asphalt batch plant" within the floodplain. Def.'s Mot. for Summ. J. Ex. 2, at 26.

Meanwhile, Plaintiff appealed the hearings officer's decision to the Land Use Board of Appeals for the State of Oregon ("LUBA"), arguing, among other things, that the hearings officer erred in concluding that an asphalt batch plant constituted the "same use" as a concrete batch plant. Def.'s Mot. for Summ. J. Ex. 2, at 15. Plaintiff argued that replacing one type of batch plant with another was an alteration and, therefore, needed to be approved by the County. Def.'s Mot. for Summ. J. Ex. 2, at 15. LUBA agreed with Plaintiff, stating that "even if the two types of batch plants constitute the 'same use,' replacing one with the other constitutes, at a minimum, an alteration that requires county review and approval." Def.'s Mot. for Summ. J. Ex. 2, at 22. LUBA, however, did not feel that the hearings officer had adequately fleshed out "the nature and extent" of the previously existing, and lawful, nonconforming use. Def.'s Mot. for Summ. J. Ex. 2, at 22. Therefore, rather than reversing, LUBA remanded the case to the hearings officer to assess this issue. Def.'s Mot. for Summ. J. Ex. 2, at 22.[2]

---

[2]In a separate opinion issued on August 26, 2014, LUBA assessed the validity of Defendant's second floodplain permit, which Plaintiff had also appealed, arguing it was invalid. Def.'s Mot. for Summ. J. Ex. 3. LUBA held that a floodplain permit could not be issued until the County had completed remand of LUBA's first order and adequately assessed the scope of the nonconforming use. Def.'s Mot. for Summ. J. Ex. 3, at 5.

After LUBA's order, but before the hearings officer conducted a remand hearing, the County reaffirmed its position that Defendant could continue to operate the asphalt batch plant while the hearings officer assessed the extent of the prior nonconforming use. Def.'s Mot. for Summ. J. Ex. 11, at 2. A week later, on August 25, 2014, the hearings officer conducted a remand hearing to consider the parameters of the nonconforming use. Def.'s Mot. for Summ. J. Ex. 12, at 2. In an order issued on October 28, 2014, the hearings officer determined that the "conversion of the concrete batch plant to an asphalt batch plant require[d] review and approval [by the County] as an alteration of a nonconforming use." Def.'s Mot. for Summ. J. Ex. 12, at 8.

Subsequent to the October 2014 order, the County issued code violations against Defendant for, among other things, installing an asphalt batch plant without first requesting an alteration permit. Def.'s Mot. for Summ. J. Ex. 15. Accordingly, there was a third hearing to determine whether Defendant could continue to operate the asphalt batch plant while Defendant "pursue[d] further applications for a final determination about the extent of the nonconforming use." Def.'s Mot. for Summ. J. Ex. 13, at 2. This time, the hearings officer determined that Defendant could not continue to operate the batch plant without first getting nonconforming-use approval from the County. Def.'s Mot. for Summ. J. Ex. 13, at 3. Moreover, the officer determined that Defendant unlawfully operated the batch plant between the October 2014 order and the then-present order, dated December 30, 2014. Def.'s Mot. for Summ. J. Ex. 13, at 3. The hearings officer did point out, however, that he did not believe Defendant had been acting in bad faith and was "sensitive to the fact that [Defendant] appear[ed] to be taking necessary and appropriate measures to resolve these matters by pursuing applications for nonconforming use." Def.'s Mot. for Summ. J. Ex. 13, at 3. As such, the officer suspended the bulk of the fine the County had levied against Defendant. In all, Defendant was fined $400 and provided thirty days

from the date of the order to "apply for all necessary permits." Def.'s Mot. for Summ. J. Ex. 13, at 4.

Within the thirty-day limit, Defendant filed an application for approval of a nonconforming use alteration. Def.'s Mot. for Summ. J. Ex. 1, at 1. On March 19, 2015, the Planning Division approved Defendant's alteration from a concrete batch plant to an asphalt batch plant. Def.'s Mot. for Summ. J. Ex. 18. Plaintiff timely appealed the Planning Division's decision. Def.'s Mot. for Summ. J. Ex. 1, at 1. On September 24, 2015, a hearings officer issued a decision determining that the asphalt batch plant was "more intensive" than the concrete batch plant, both in the number of employees and the "continuity" of the plant's operation over the course of the year, resulting in "a greater adverse impact on the surrounding neighborhood." Def.'s Mot. for Summ. J. Ex. 19, at 2. The officer reversed the Planning Division's decision and denied Defendant's application. Def.'s Mot. for Summ. J. Ex. 1, at 41.

Four days after the hearings officer's decision denying Defendant's application, the County notified Defendant that it would impose an $800-per-day fine for every day Defendant continued to operate the batch plant without the necessary approvals. Def.'s Mot. for Summ. J. Ex. 25, at 3. About a week later, DEQ sent a notification to Defendant informing Defendant DEQ had been apprised of the fact that Defendant "d[id] not have land use approval to operate its portable asphalt facility" at its current location. Def.'s Mot. for Summ. J. Ex. 16, at 1. DEQ further stated that failure to comply with local land use laws was in direct violation of Defendant's ACD permit. Def.'s Mot. for Summ. J. Ex. 16, at 1. DEQ informed Defendant that continued operation of the batch plant would result in formal enforcement action against Defendant. Def.'s Mot. for Summ. J. Ex. 16, at 2.

Facing immediate enforcement from both the County and DEQ, Defendant appealed the hearings officer's decision denying Defendant's application to LUBA. Def.'s Mot. for Summ. J. Ex. 19. Defendant also moved for a stay of the hearings officer's decision, arguing the hearings officer misapplied the facts and Oregon law. Def.'s Mot. for Summ. J. Ex. 25, at 1, 6. LUBA granted Defendant's stay request and enjoined the hearings officer's order pending its decision on Defendant's appeal. Def.'s Mot. for Summ. J. Ex. 25, at 14. A few months later, on January 11, 2016, LUBA lifted the stay and upheld the hearings officer's denial of Defendant's application, holding that Defendant "present[ed] no basis for LUBA to second-guess the hearings officer." Def.'s Mot. for Summ. J. Ex. 19, at 3.

On January 21, 2016, the County again issued a citation for unlawfully operating the asphalt batch plant and conducting associated activities. Def.'s Mot. for Summ. J. Ex. 26, at 10. The County argued Defendant wrongfully engaged in these activities from September 24, 2015, to January 21, 2016. Def.'s Mot. for Summ. J. Ex. 26, at 10. On March 18, 2016, a hearings officer determined that Defendant "allowed operation of the Asphalt Plant in violation of" the September 2015 order "from September 25, 2015 until LUBA granted a stay on October 21, 2015," a total of twenty-six days. Def.'s Mot. for Summ. J. Ex. 26, at 14. The hearings officer established that Defendant was not in violation of any ordinance for operating the batch plant while LUBA's stay was in place. Def.'s Mot. for Summ. J. Ex. 26, at 14. Additionally, the officer found "no evidence the Asphalt Plant operated after January 11, 2016." Def.'s Mot. for Summ. J. Ex. 26, at 9, 14. Consequently, the hearings officer imposed a fine against Defendant for $5,200.00, amounting to $200 per day for twenty-six days. Def.'s Mot. for Summ. J. Ex. 26, at 16.

Notably, the hearings officer also determined that Defendant had: (1) unlawfully constructed an office building without a building permit and wired the office building without an electrical permit; (2) impermissibly allowed the accumulation of solid waste on the property; and (3) operated the asphalt batch plant and the office building within a flood-hazard area without obtaining the required floodplain permits. Def.'s Mot. for Summ. J. Ex. 26, at 14-15. The hearings officer held that, excluding the batch plant—which ceased operations on January 11, 2016—Defendant had continuously engaged in these violations from September 25, 2015, until the citation was issued on January 21, 2016, representing an ongoing "violation period of 119 days." Def.'s Mot. for Summ. J. Ex. 26, at 14-15. The hearings officer imposed an additional $16,500 in fines for these violations. In total, Defendant was fined $21,700.00. Def.'s Mot. for Summ. J. Ex. 26, at 16.

Defendant has since moved its asphalt batch plant to a separate location, Weaver Decl. Ex. 28; Second Hamilton Decl. ¶ 7 [ECF No. 91.], and the County is currently allowing Defendant to operate its batch plant at the new location. Weaver Decl. Ex. 28, at 3. However, Defendant apparently continues to engage in associated activities on the property; there have been reports of "trucks and equipment going back and forth on the property," and Defendant acknowledges it "intends to continue all activities on the property except for the Asphalt Batch Plant," as the incidental activities, Defendant argues, "are independent of the production of asphalt and are not dependent upon the production of asphalt." Second Hamilton Decl. ¶ 4; Def.'s Resp. to Pl.'s Interrog. No. 9 [ECF No. 79.]. On August 29, 2016, however, LUBA determined that Defendant was improperly conducting "accessory uses" on the property, as "the LDO does not allow processing aggregate material in the absence of aggregate mining on the site, or processing of material that is not 'naturally occurring material.'" Pl.'s Partial Cross-Mot.

for Summ. J. Ex. 7, at 10 [ECF No. 89.]. Accordingly, at least some of Defendant's associated activities appear to be in violation of local land use laws.

Meanwhile, on September 30, 2015, while the validity of Defendant's asphalt batch plant was moving through Oregon's land use system, Plaintiff filed the present suit in this Court. *See* Compl. [ECF No. 1.]. Plaintiff's lawsuit is based on a provision of the CAA that allows a private plaintiff to initiate judicial proceedings against a defendant "who is alleged to have violated . . . or to be in violation of . . . an emission standard or limitation." Compl., at ¶¶ 35-37; 42 U.S.C. § 7604(a)(1). Plaintiff notes that the phrase "violation of . . . an emission standard or limitation" includes violations of any state or local permit term or condition. Compl., at ¶ 23 (citing 42 U.S.C. § 7604(f)(4)). Plaintiff argues that Defendant's operation of its asphalt batch plant, as well as associated activities, was, and continues to be, in violation of its ACD permit, which requires that Defendant be in compliance with all local land use regulations. Plaintiff argues Defendant has never obtained the proper land use approvals from the County. While Defendant submitted numerous applications seeking land use approval for its batch plant, and Planning Staff initially approved each application, Plaintiff points to the fact that each of Defendant's applications were ultimately denied by either the County or LUBA. Accordingly, Plaintiff maintains that Defendant was never operating its batch plant or its associated activities lawfully and, thus, at all times, was in violation of its ACD permit.[3]

In addition to its current claims for relief, now before the Court on the parties' cross-motions for summary judgment, Plaintiff originally requested a preliminary injunction, enjoining Defendant from operating its batch plant until the Court issued a final judgment on the merits.

---

[3]Plaintiff argues, in the alternative, that Defendant has, at all times, been in violation of the CAA for operating its batch plant without any of the requisite zoning permits. The Court finds no meaningful difference between Plaintiff's alternative argument and its primary argument; both contend Defendant failed to procure local land use approval for its batching operation and all associated activities, thus violating the CAA. Consequently, the Court treats them as the same argument.

Mot. for Prelim. Inj. [ECF No. 6.]. On January 21, 2016, ten days after Defendant ceased operating its batch plant on the property, the parties stipulated to a preliminary injunction, which the Court signed the next day. [ECF Nos. 60, 61 & 62.]. The preliminary injunction precluded Defendant from operating its batch plant on the property but specifically provided that Defendant "has not stipulated to cease using any other equipment or vehicles on its property[,] including, but not limited to, the rock crusher, screen plant, and stock piles." Order for Stipulated Preliminary Injunction, at 4. Additionally, the preliminary injunction neither prohibited nor required Defendant to dismantle or move its batching operating to a separate facility. Order for Stipulated Prelim. Inj., at 4.

Defendant now moves for summary judgment. Defendant argues Plaintiff's only argument is that Defendant "is in violation of the CAA solely because it does not have County approvals, which represents a technical violation of [D]efendant's [ACD] Permit requiring such approvals." Def.'s Br. in Supp. of Its Mot. for Summ. J., at 1-2. Whether or not Defendant procured the necessary land use approvals, however, "is a matter committed to the exclusive jurisdiction of the County and [LUBA]," and, Defendant argues, the evidence aptly demonstrates that Defendant "had approval from the County and LUBA to operate its batch plant," as well as all associated activities, at all relevant times. Def.'s Br. in Supp. of Its Mot. for Summ. J., at 2; Def.'s Br. in Supp. of Its Mot. for Summ. J., at 19. This Court, Defendant contends, is therefore without jurisdiction to second guess the County's and LUBA's approval. Def.'s Br. in Supp. of Its Mot. for Summ. J., at 2. Defendant cites 42 U.S.C. § 7431 for the proposition that nothing in the CAA "constitutes an infringement on the existing authority of counties and cities to plan or control land use, and nothing in [the CAA] provides or transfers authority over such land use."

Finally, in the alternative, Defendant argues that even if the Court ultimately determines Defendant was in violation of its ACD permit, and therefore the CAA, Plaintiff's claims are moot because Defendant has moved its batching operation to a separate facility "upon LUBA's order of January 11, [2016]." Def.'s Br. in Supp. of Its Mot. for Summ. J., at 26. Consequently, any violations Defendant committed are not reasonably likely to recur, mooting Plaintiff's request for declaratory relief, injunctive relief, and civil penalties, and necessitating summary judgment in Defendant's favor.

Plaintiff filed a cross-motion for partial summary judgment. Plaintiff's cross-motion is solely on the issue of whether Defendant's asphalt batching operation violated the CAA, arguing the record undisputedly demonstrates Defendant operated its batch plant without local land use approval, in violation of its ACD permit and thus the CAA. Unlike Defendant, Plaintiff does not move for summary judgment on the issue of whether Defendant's associated activities violated federal environmental laws, but it does object to Defendant's summary judgment motion on this issue. The Court will address the batching operation and the associated activities separately.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d

796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

### I.      Jurisdiction

The CAA vests the Court with jurisdiction to determine whether or not Defendant has violated the CAA. Congress passed the CAA to avert pollution and to "protect and enhance the quality of national air resources." *Communities for a Better Env't v. Cenco Ref. Co.*, 180 F. Supp. 2d 1062, 1068 (C.D. Cal. 2001) (citing 42 U.S.C. § 7401). The CAA provides a regulatory framework that is "designed to prevent and control air pollution." *Id.* The Environmental Protection Agency (the "EPA") is directed to set forth national ambient air quality standards ("NAAQS") at a level adequate to protect the public's health and welfare. 42 U.S.C. § 7409(a)-(b).

To achieve the NAAQS laid out by the EPA, each state must develop a state implementation plan ("SIP"). 42 U.S.C. § 7410(a). The EPA is permitted to approve a SIP only if the plan satisfies all requirements of the CAA. 42 U.S.C. § 7410(a)(3)(A), 7502(b). Upon EPA

approval, the SIP's requirements and commitments become lawfully binding upon the state. 42 U.S.C. § 7413(a)(2).

The EPA conditionally approved Oregon's SIP on June 24, 1980; the SIP was approved without conditions on November 5, 1981. *Nw. Envtl. Def. Ctr. v. Cascade Kelly Holdings LLC*, 155 F. Supp. 3d 1100, 1106 (D. Or. 2015) (citing 46 Fed. Reg. 54939-02; 45 Fed. Reg. 42265-01). Oregon's SIP is administered by DEQ, and Oregon's SIP provisions are codified in Oregon statutes and administrative rules. *See* OAR § 340-200-0040. The Oregon SIP states that "[n]o person may construct, install, establish, develop or operate any air contaminant source . . . without first obtaining an [ACD permit] from DEQ." OAR § 340-216-0020. Air contaminant is broadly defined and includes carbon, acid, a regulated pollutant, or any such combination. OAR § 340-200-0020(8). A source is defined as a facility emitting, or capable of emitting, air contaminant into the atmosphere. OAR § 340-200-0020(166).

Here, Defendant is correct that Oregon has vested LUBA with exclusive jurisdiction to review and interpret any land use decision. *See* Or. Rev. Stat. § 197.825(1) (stating that LUBA "shall have exclusive jurisdiction to review any land use decision or limited land use decision of a local government"). However, "a SIP, once approved by EPA, has 'the force and effect of federal law.'" *Safe Air For Everyone v. U.S. E.P.A.*, 488 F.3d 1088, 1097 (9th Cir. 2007) (quoting *Trustees of Alaska v. Fink*, 17 F.3d 1209, 1210 n. 3 (9th Cir. 1994)). Thus, a SIP becomes federal, not state, law once approved by the EPA. *Id.* "Consequently, [a] state's interpretation of the regulations incorporated into [a] SIP, even if binding as a matter of state law, is not directly dispositive of the meaning of the SIP." *Id.*

Hence, the CAA vests the Court with jurisdiction to determine whether or not Defendant has violated Oregon's SIP. Oregon's SIP requires an individual who constructs an air

contaminant source to be in compliance with a DEQ-issued ACD permit; thus, it is perfectly within this Court's jurisdictional purview to assess whether or not Defendant was in violation of its ACD permit and, by extension, Oregon's SIP. And, in assessing whether or not Defendant was in violation of its ACD permit, the Court must evaluate whether or not Defendant violated local land use laws, as the ACD permit requires Defendant to be in compliance with all local land use regulations. In doing so, however, the Court does not infringe "on the existing authority of counties and cities to plan or control land use"; rather, the Court specifically defers to local land use law and asks whether or not Defendant violated it. This is precisely what 42 U.S.C. § 7431's language contemplates. Consequently, the Court finds that it has jurisdiction to assess Defendant's compliance with its ACD permit. Accordingly, the Court addresses the merits of the parties' claims below, starting with the batching operation and concluding with Defendant's associated activities.

**II.    Batching Operation**

As will be discussed, even assuming Defendant did violate the CAA by allegedly operating its batch plant in violation of its ACD permit and without any of the requisite zoning permits, Plaintiff's claims for declaratory relief, injunctive relief, and civil penalties are moot because the batch plant has been relocated and there is no reasonable expectation that Defendant will resume batching operations on the property, thus necessitating summary judgment on this issue in Defendant's favor.

///

///

///

## A. Mootness[4]

A federal court lacks jurisdiction to decide a moot claim. *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992). "A claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997) (internal citation omitted). However, courts recognize a "voluntary cessation" exception to the mootness doctrine. *Rosemere Neighborhood Ass'n v. U.S. E.P.A.*, 581 F.3d 1169, 1173 (9th Cir. 2009). "Under this doctrine, the mere cessation of illegal activity in response to pending litigation does not moot a case, unless the party alleging mootness can show that the 'allegedly wrongful behavior could not be reasonably expected to recur.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). By contrast, when the defendant's cessation is not voluntary, but "instead the result of [the plaintiff's] successful administrative appeal," the action is moot, as there is no reasonable expectation of recurrence. *Or. Nat. Res. Council, Inc. v. Grossarth*, 979 F.2d 1377, 1379 (9th Cir. 1992).

### 1. Declaratory Relief

Article III's limitations "are not relaxed in the declaratory judgment context." *Gator.com v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005). "Indeed, the case-or-controversy requirement is incorporated into the language of the very statute that authorizes federal courts to issue declaratory relief." *Id.* (citing 28 U.S.C. § 2201). In a case where a plaintiff seeks declaratory relief, the test is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Biodiversity Legal*

---

[4]Although neither party raises the issue, it should be noted that Plaintiff has standing to bring this suit. "Standing is determined as of the commencement of litigation." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002). At the time Plaintiff filed its case, Defendant's alleged violations were ongoing. Thus, Plaintiff has standing to bring this suit because, at the time Plaintiff brought suit, Plaintiff could have abated Defendant's alleged violations. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 188 (2000).

*Found. v. Badgley*, 309 F.3d 1166 1174-75 (9th Cir. 2002) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (internal quotations omitted). In other words, the question is "whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion of meaningful relief." *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 n. 4 (9th. Cir. 2000) (quoting 13A Charles Alan Writ et al., *Federal Practice and Procedure* § 3533.3, at 268 (1984) (internal quotations omitted).

The Court finds that Plaintiff's request for declaratory relief is moot because Defendant has ceased operating its asphalt batch plant on the property and may not lawfully resume its operation. Indeed, on September 24, 2015, a County hearings officer denied Defendant's application to operate its asphalt batch plant as an alteration to a nonconforming use; this decision was upheld by LUBA on January 11, 2016. Defendant has since moved its batch plant, and "[t]here is no evidence the Asphalt Plant operated after January 11, 2016." Def.'s Mot. for Summ. J. Ex. 26, at 14. This is not a case where Defendant voluntarily ceased operations. *See Laidlaw*, 528 U.S. at 189 (holding that the defendant's voluntary decision to shut down its facility does not render a case moot unless it is absolutely clear the defendant's violations could not be expected to recur). Instead, Defendant's cessation was the result of Plaintiff's successful administrative appeal, which led to a final order from LUBA[5] affirming the County hearings officer's decision that expressly forbids Defendant from engaging in its batching operation on the property. Accordingly, the controversy at issue—whether Defendant can operate its batch plant on the property—has been decided, and Defendant is not "free to return to [its] old ways."

---

[5]A party to a LUBA proceeding has the right to judicial review of the agency's final order, but, in order to retain the right to judicial review, the appellant must file its petition within twenty-one days of "the date the board delivered or mailed the order upon which the petition is based." Or. Rev. Stat. § 197.850. LUBA issued its order on January 11, 2016; however, Defendant has not filed a petition for review. Accordingly, LUBA's decision is final, and neither party appears to dispute this.

*Id.* Hence, the changes in circumstances that existed at the inception of litigation "have forestalled any occasion of meaningful relief." *West*, 206 F.3d at 925 n. 4.

In an effort to create a genuine dispute of fact to survive summary judgment, however, Plaintiff states that it "does dispute whether Defendant's operations continued after [January 11, 2016]." Pl.'s Br. in Supp. of Its Cross-Mot. for Summ. J., at 46 (emphasis in original). In support of this argument, Plaintiff offers a declaration from Mary Hamilton, a resident of the Mountain View Estates retirement community. The declaration states Ms. Hamilton heard "equipment noise" and that she "noticed trucks and equipment going back and forth on the property with load after load of material creating a large new stockpile near the asphalt plant." Second Hamilton Decl. ¶¶ 4, 5. Confusingly, however, the declaration acknowledges Defendant has since moved the asphalt batch plant to a separate location and never states the plant operated after January 11, 2016. Second Hamilton Decl. ¶ 7.

"Bald assertions that genuine issues of material fact exist are insufficient," and a mere scintilla of evidence in support of a party's position is also inadequate. *Galen v. City of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) (internal citations omitted). Here, Plaintiff's conclusory assertion that it disputes whether the batch plant operated after January 11 is clearly insufficient to create a genuine issue of fact; and, at best, the declaration Plaintiff offers in support of its position constitutes a mere scintilla of evidence. There is nothing in the declaration that would create even a colorable claim that the batch plant continued to operate after January 11, 2016. To the contrary, the declaration acknowledges the batch plant has moved. Thus, when viewed against the hearings officer's finding that there is no evidence suggesting batching operation after January 11, 2016, Plaintiff's evidence falls well short of that required to create a

genuine issue of material fact. Consequently, the Court finds Defendant did not operate its batch plant following LUBA's order on January 11, 2016.

Finally, Plaintiff argues that Defendant did not move its batching operation in response to LUBA's order but rather "voluntarily" moved its batching operation after this Court entered its preliminary injunction on January 21, 2016. Pl.'s Reply in Supp. of Its Cross-Mot. for Partial Summ. J., at 16. Plaintiff thus charges that as soon as this Court lifts the preliminary injunction, nothing prevents Defendant from moving its batch plant back to the property. In support of this argument, Plaintiff points to the fact that "the factual history of this case illustrates that Defendant has never before been deterred from violating local land use and zoning laws or the Clean Air Act by the threat of fines or enforcement" and that, in any case, Defendant did not even move its batching operating "until after this Court issued the preliminary injunction." Pl.'s Reply in Supp. of Its Cross-Mot. for Partial Summ. J., at 17

First, Plaintiff's argument that Defendant "voluntarily" halted and moved its batching operation because of this Court's preliminary injunction is in direct contravention of the facts in the record. As discussed, the evidence in the record convincingly supports the finding that Defendant ceased operating its batch plant on the property on January 11, 2016, as a result of LUBA's decision to uphold the County hearings officer's determination that denied Defendant's application for a nonconforming use alteration. Ten days later, on January 21, 2016, the parties stipulated to a preliminary injunction, which the Court signed. Accordingly, to argue that Defendant voluntarily ceased and moved operations is to ignore the fact that Defendant had already ceased batching operations ten days before any preliminary injunction order was issued and that the exclusive reason for Defendant's cessation was Plaintiff's successful administrative

appeal, which led to a final order from LUBA affirming the County hearings officer's order that expressly forbidding Defendant from operating its batch plant on the property.

As for Plaintiff's argument that Defendant has never before been deterred from violating the law by threat of fines or enforcement and will not be in the future, the Court disagrees. The threat of fines or enforcement that Plaintiff speaks of occurred while Defendant was in the process of obtaining verification that its asphalt batch plant was a lawfully established nonconforming use. In other words, the legality of Defendant's batching operation remained outstanding at the time these fines were imposed. By way of example, following the September 26, 2013, hearings officer's order finding unauthorized expansions on the property, the County cited Defendant for violating floodplain and building permit ordinances. Thereafter, the County and Defendant entered into a stipulated agreement that allowed Defendant to continue to engage in nonconforming uses while Defendant "procee[ed] through the County's land use process." Def.'s Mot for Summ. J. Ex. 11, at 2. Over the next two years, Defendant continued to "proceed through the County's land use process," Def.'s Mot for Summ. J. Ex. 11, at 2, and each subsequent code violation issued by the County occurred while Defendant continued to do so.

It was not until January 11, 2016, that LUBA conclusively affirmed the County hearings officer's decision that expressly forbid Defendant from engaging in its batching operation on the property. At this point, and for the first time, Defendant no longer had a viable avenue for obtaining permission to operate his asphalt batch plant on the property. Accordingly, Defendant immediately ceased operations and moved its batching operation to a location where it could operate with County approval. Thus, far from lacking a deterrent effect, the record unequivocally establishes that LUBA's final, binding order permanently halted Defendant's unlawful batching operation and adequately persuaded Defendant to move the operation to a new, lawful location.

Hence, Plaintiff's argument that Defendant has never before been deterred from violating the law by threat of fines or enforcement and will not be in the future simply fails to comport with the facts. Consequently, the controversy at issue has been conclusively decided by LUBA; Defendant is not "free to return to [its] old ways," thus mooting the need for declaratory relief.

## 2. Injunctive Relief

Plaintiff's request for injunctive relief is moot. As stated, Defendant ceased operating its batch plant on the property nine months ago. Defendant's discontinuance was the result of Plaintiff's successful administrative appeal, and for the reasons articulated, the Court finds Defendant is adequately deterred from returning its batch plant to the property. Consequently, the controversy at issue has been decided, negating any need for injunctive relief.

Arguing against mootness, however, Plaintiff cites to a recently decided Ninth Circuit case, *Nat. Res. Def. Council v. Cty. of Los Angeles et al.*, No. 15-55562, 2016 WL 6407422 (9th Cir. Oct. 31, 2016). In that case, the plaintiff appealed the district court's dismissal of its claims for injunctive relief as moot. *Id.* at *1. The plaintiffs had filed suit alleging the defendants were discharging polluted storm water, a violation of their Pollutant Discharge Elimination System ("NPDES") permit. *Id.* The Ninth Circuit had earlier determined that the defendants had violated their NPDES permit as a matter of law; thus, the court remanded the case to the district court for a remedies determination. *Id.* In 2012, while litigation remained ongoing, the defendants successfully obtained a new NPDES permit; both permits had "substantially the same baseline receiving water limitations." *Id.* The 2012 permit, however, was more complicated, creating a "safe harbor program," which allowed the defendants to "initiate, develop, revise, and implement a voluntary watershed management program or enhanced watershed management program." *Id.* at *1-2. By initiating either of the two programs, the defendants were deemed to be in

compliance with baseline receiving water limitations in their permit, and if defendants successfully completed an enhanced watershed management program, the defendants would be exempt from all water limitations requirements and other restrictions in their permit. *Id.* at \*2.

Because they had initiated seven water shed management programs and twenty-three enhanced watershed management programs, the defendants argued they were in compliance with their permit, mooting plaintiff's request for injunctive relief. *Id.* The district court agreed with the defendants, but the Ninth Circuit reversed. *Id.* at \*2, \*6. First, as the appellate court noted, and the defendants themselves conceded, the 2012 safe harbor program was voluntary. *Id.* at \*2. Thus, the court stated, the defendants were obligated to demonstrate their allegedly wrongful behavior was not reasonably expected to recur, a requirement the defendants could not meet. *Id.* at \*4. Indeed, there was no evidence in the record, the court concluded, "that the County Defendants would not violate the receiving water limitations in the future." *Id.* at \*5. To the contrary, there was the potential for the safe harbor program to be deemed invalid, thus raising questions about the defendants' ability to remain in compliance with their permit. *Id.*

Furthermore, even if the safe harbor program was ultimately upheld, the defendants still had to implement their proposed watershed programs, and the plaintiff provided evidence tending to show defendants' successful implementation was unlikely. *Id.* at \*6. Accordingly, the Ninth Circuit determined the defendants had not shown that their allegedly wrongful behavior was not reasonably expected to recur, and injunctive relief was warranted. *Id.*

The facts here present a markedly different scenario. First, unlike the defendants in *Natural Resources*, who conceded their decision to engage in the safe harbor program was entirely voluntary, Defendant's decision to cease operating his batch plant on the property at issue was wholly involuntary; in fact, despite Defendant's best efforts to obtain a nonconforming

use alteration and continue operating its batch plant on the property, both the County and LUBA denied Defendant's application for a nonconforming use alteration, thereby precluding Defendant from conducting its asphalt batching operation on the property. Accordingly, unlike in *Natural Resources*, Defendant's theory of mootness is not "based on . . . a 'voluntary cessation' of an illegal activity," *id.* at *5, but instead, is based on the fact that Plaintiff's successful administrative appeal led to a final order from LUBA expressly forbidding Defendant from engaging in its batching operation on the property, conclusively resolving the controversy at issue.

Indeed, Defendant has no ability to challenge LUBA's order. Under Oregon law, a party to a LUBA proceeding has the right to judicial review of the agency's final order; however, the appellant must file its petition within twenty-one days of "the date the board delivered or mailed the order upon which the petition is based." Or. Rev. Stat. § 197.850. LUBA issued its order on January 11, 2016. Defendant has not filed a petition for review. Accordingly, LUBA's decision to deny an asphalt batch plant on the property is final, and a permanent injunction forbidding Defendant's use of the batch plant on the property would be entirely superfluous, as the issue has simply lost its present, live controversy. *See Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) ("We have described moot cases as those which have lost their character as present, live controversies"). Consequently, the Court finds Plaintiff's request for injunctive relief forbidding Defendant from conducting its asphalt batching operation on the property to be moot.

### 3. Civil Penalties

Plaintiff seeks civil penalties of up to $37,500 for each day Defendant was in violation of its air quality permit and, by extension, the CAA, arguing "[t]here is no dispute that Defendant

has operated [its asphalt batch plant] in violation of its federally enforceable air quality permit at least 908 separate days over the pays five years." Pl.'s Br. in Supp. of Its Cross-Mot. for Summ. J., at 3. Plaintiff maintains that civil penalties attach at the time of the Defendant's CAA violations, not at the time of judgment. Hence, its claim for civil penalties is not rendered moot regardless of whether Defendant is capable of resuming its past CAA violations.

"The penalties provisions of the CAA and the Clean Water Act ("CWA") are virtually identical; thus, CWA cases are instructive in analyzing issues arising under the CAA." *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1094 n. 2 (10th Cir. 2007). Civil penalties under the CWA and CAA exist to deter future violations and serve as an alternative to injunctive relief. *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1159 (9th Cir. 2002) (internal citations omitted). Civil penalty liabilities attach at the time the violation occurs, not at the time of the judgment. *Id.* at 1160. "That a defendant ceases illegal conduct following the commencement of suit ordinarily does not suffice to moot a case because civil penalties still serve as a deterrent to future violations." *Assoc. of Irritated Residents v. Fred Schakel Dairy*, 460 F. Supp. 2d 1185, 1190 (E.D. Cal. 2006) (citing *San Francisco BayKeeper*, 309 F.3d at 1159-60)). "[T]he overwhelming majority of circuits that have encountered the issue have held that even if post-complaint compliance should moot a citizen's claim for injunctive relief, the citizen's claim for civil penalties is not moot." *Anderson v. Farmland Indust., Inc.*, 70 F. Supp. 2d. 1218, 1235 (D. Kan. 1999) (citing *Comfort Lake Ass'n, Inc. v. Dresel Contracting Inc.*, 138 F.3d 351, 356 (8th Cir. 1998); *Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir. 1997), *cert. denied*, 522 U.S. 981 (1997); *Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 503 (3d Cir. 1993); *Atlantic States Legal Found., Inc. v. Pan Am. Tanning Corp.*, 993 F.2d 1017, 1021 (2d Cir. 1993); *Carr v. Alta Verde Indus. Inc.*, 931

Case 1:15-cv-01854-CL   Document 103   Filed 11/15/16   Page 25 of 32

F.2d 1055, 1065 n. 9 (5th Cir. 1991); *Atlantic States Legal Found., Inc. v. Tyson Foods Inc.*, 897 F.2d 1128, 1135 (11th Cir. 1990); *Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.*, 807 F.2d 1089, 1094 (1st Cir. 1986)). Indeed, the Ninth Circuit has held that "post-commencement compliance may moot claims for injunctive relief, but district courts can still impose civil penalties for violations that have taken place." *San Francisco BayKeeper*, 309 F.3d at 1160. Events following the commencement of a suit will moot a claim for civil penalties only when it is "absolutely clear" the allegedly wrongful conduct could not be reasonably expected to recur. *Laidlaw*, 528 U.S. at 190 (citing *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

In *WildEarth*, the Tenth Circuit addressed the "rare exception" where a defendant's subsequent compliance with the law moots a plaintiff's claim for civil penalties. *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174 (10th Cir. 2012). In that case, the plaintiffs brought suit against the defendant, a public utility company, for alleged violations of the CAA. *Id.* at 1178. The plaintiffs claimed the defendant's construction of a coal-fired power plant violated the CAA because the defendant failed to procure the necessary construction permit. *Id.* Although the defendant had initially complied with all federal and state laws when construction began, the federal regulatory landscape changed three years into construction, and the defendant fell out of compliance with the CAA. *Id.* The defendant, however, worked with the necessary agencies to come back into compliance, and while the litigation was pending, achieved compliance with the new regulatory scheme. *Id.*

Because it had achieved compliance with the CAA while the lawsuit was ongoing, the defendant argued the case was moot and that civil penalties were therefore unwarranted. *Id.* at 1186. The court explained that "in most citizen suits, a plaintiff's claim for civil penalties is not

Page 25 – ORDER

rendered moot by the defendant's compliance with the law because the plaintiff retains a concrete interest in deterring the defendant from future violations." *Id.* This case, the court explained, was different, because "*Laidlaw*'s 'absolutely clear' standard [was] met." *Id.* First, the court stated, the defendant's original permit was valid at the time it began construction and only came into noncompliance as a result of an unforeseen D.C. Circuit decision that struck down the EPA's then-present regulatory scheme. *Id.* Accordingly, nothing indicated the defendant had a "history or pattern" of violations that warranted a deterrent. *Id.* Second, the defendant took all reasonable steps and made all efforts to comply with the CAA and worked with state and federal agencies to come into compliance once new rules went into effect. *Id.* at 1186-87. "These compliance efforts," the court stated, "weigh[ed] significantly against finding that the violation here . . . could reasonably be expected to recur." *Id.* at 1187.

While the court acknowledged the defendant could have done more to ensure compliance, like ceasing construction once it became clear it had fallen out of compliance, the defendant's decision to continue construction, something the government instructed the defendant to do, "does not suggest a likelihood of future unlawful conduct needing to be deterred." *Id.* Consequently, the court held that the plaintiff's request for civil penalties would have no deterrent effect and would only serve the public's "general interest" in CAA compliance. *Id.* As such, the court dismissed the plaintiff's claim for civil penalties as moot. *Id.* at 1187-88.

The issue here also presents the "rare exception" where *Laidlaw*'s "absolutely clear" standard is met. Much like the defendant in *WildEarth*, Defendant argues Plaintiff's claim for civil penalties is moot because Defendant moved its batching operation, ceasing its alleged ACD permit violation. Defendant's argument is compelling. While it is true that, unlike the defendant

in *WildEarth*, whose permit was unquestionably valid at the time construction began, Defendant initially constructed its asphalt batch plant without County approval, the evidence nonetheless shows that Defendant honestly believed its operation was legal, a belief that was reinforced by the requisite state agencies. As late as 2012, DEQ stated that "as the County views it currently, the facility is allowed to operate and be placed at its current site." Def.'s Mot. for Summ. J. Ex. 7. And, like the defendant in *WildEarth*, Defendant also made reasonable efforts to obtain the necessary approval from the County. As one hearings officer stated, "[Defendant] appear[ed] to be taking necessary and appropriate measures to resolve these matters by pursuing applications for nonconforming use." Def.'s Mot. for Summ. J. Ex. 13, at 3. Moreover, once LUBA issued its decision conclusively denying Defendant's application for approval of a nonconforming use, Defendant ceased its batching operation and has since moved the batch plant in an effort to comply with the County's and LUBA's holding. As the court stated in *WildEarth*, such compliance efforts weigh against finding that the violation at issue here could reasonably be expected to recur.

Third, the Court acknowledges Defendant could certainly have done more, including ceasing its batching operation while it sought County approval. Nevertheless, the Court is cognizant of the costs this would have imposed on Defendant, and, while significant costs alone do not justify noncompliance, in light of the fact that the County, on separate occasions, affirmatively allowed Defendant to continue its operation during the land use appeals process, the Court does not believe Defendant's continued operation during this process suggests a likelihood of future unlawful conduct. This belief is reinforced by the fact that Defendant moved its batching operation in response to LUBA's order, suggesting a commitment to compliance rather than a likelihood of falling out of compliance.

As the Ninth Circuit stated in *San Francisco BayKeeper*, "[c]ompletely dismantling a polluting facility might eliminate the need for the deterrent effect of civil penalties." 309 F.3d at 1160. *Id.* Here, Defendant has removed its batching operation from the property. While the entire facility has not been dismantled, the issue here is whether there is a likelihood Defendant will resume its batching operation on the property. Because the batch plant has been removed, the Court believes the need for the deterrent effect of civil penalties has been eliminated. In fact, it would be counterintuitive for Defendant to reinstate batching operations at the disputed facility, given the fact that it has already begun operations at a separate facility and reinstating the operation would result in hefty fines from the County. Consequently, the Court finds Defendant has demonstrated that its conduct is not reasonably likely to recur.

### a. Summary

For the above-mentioned reasons, Plaintiff's claim for declaratory relief, injunctive relief, and civil penalties relating to Defendant's allegedly unlawful batching operation is moot, and summary judgment on this issue must therefore be granted in Defendant's favor.

## III. Defendant's Associated Activities

Plaintiff states it also "intends to demonstrate that Defendant is [] liable for conducting 'associated activities' in violation of its air quality permit" and argues the Court should issue declaratory and injunctive relief and impose civil penalties on Defendant for these violations of the CAA. Pl.'s Br. in Supp. of Its Mot. for Summ. J., at 2 n. 2. Defendant moves for summary judgment on this issue, arguing the evidence demonstrates Defendant "had approval from the County and LUBA" to operate associated activities at all relevant times. Def.'s Br. in Supp. of Its Mot. for Summ. J., at 19. In addition, Defendant argues its associated activities do not constitute an air contaminant source and therefore do not require an ACD permit. Because no ACD permit

is required to conduct its associated activities, Defendant maintains that it cannot, as a matter of law, be in violation of the CAA, as Plaintiff's only argument is that Defendant "is in violation of the CAA solely because it does not have County approvals, which represents a technical violation of [D]efendant's [ACD] Permit requiring such approvals." Def.'s Br. in Supp. of Its Mot. for Summ. J., at 1-2. Plaintiff counters Defendant's argument, asserting that Defendant's associated activities fall under the permit's broad language requiring a permittee to be in compliance with land use or zoning laws for all "activities[] and insignificant activities." Compl. Ex. B, at 2. And because LUBA determined that Defendant was improperly conducting "accessory uses" on the property, Defendant is in violation of both its ACD permit and, by extension, the CAA. Pl.'s Partial Cross-Mot. for Summ. J. Ex. 7, at 10.

Neither party disputes Defendant continues to engage in associated activities on the property at issue. These activities include stockpiling and hauling asphalt that will subsequently be run through Defendant's rock crusher and "used as road base," though, apparently, no actual rock crushing will be conducted on the property. Def.'s Resp. to Pl.'s Interrog. Nos. 13 & 15. On August 29, 2016, LUBA determined Defendant was improperly conducting "accessory uses" on the property, as "the LDO does not allow processing aggregate material in the absence of aggregate mining on the site, or processing of material that is not 'naturally occurring material.'" Pl.'s Partial Cross-Mot. for Summ. J. Ex. 7, at 10. Accordingly, at least some of Defendant's associated activities appear to be in violation of local land use laws. Consequently, if these activities do fall under the ACD permit, Defendant would be in violation of its permit for operating in violation of local land use laws.

Based on the plain language of the ACD permit, the Court finds that a dispute exists as to whether or not Defendant's associated activities violate its permit. The ACD permit's language states:

> This permit is not valid * * * at any location where the operation of the permittee's processes, activities, and insignificant activities would be in violation of any local land use or zoning laws. * * * It is the permittee's sole responsibility to obtain local land use approvals, as, or where, applicable before operating this facility at any location.

Compl. Ex. B, at 2. Plaintiff argues Defendant's stockpiling, hauling, and other actions fall under the "activities or insignificant activities" clause in the permit and because Defendant's stockpiling, hauling, and other actions appear to be "in violation of local land use or zoning laws," Defendant is clearly violating its ACD permit. Moreover, because Defendant is violating its permit, it is violating the CAA. Defendant, by contrast, maintains that such "activities are independent of the production of asphalt and are not dependent upon the production of asphalt" and therefore do not fall under the permit's coverage.

While Defendant states the associated activities are independent of asphalt production, nothing outside of this statement indicates the batch plant and the associated activities are not, at the very least, insignificantly related activities; indeed, prior to moving its batch plant, the raw material stored in stock piles would be "refined through the crusher [and] mixed with asphalt in the batch plant." Def.'s Mot. for Summ. J. Ex. 2, at 5. Defendant continues to stockpile raw material on the disputed property, and aside from its conclusory statement that its associated activities "are independent of the production of asphalt," Defendant fails to explain how it is that the raw material it currently stockpiles on the property is no longer "mixed with asphalt in the batch plant," an integral part of its batching operation. At the summary judgment stage, Defendant has the burden of showing, with evidence, that no material issue exists for trial. Its

conclusory statement is not enough, especially in light of the surrounding evidence. Furthermore, the permit expressly states that it "is issued . . . for the following source category: Asphaltic concrete paving plan, stationary or portable, *and associated material handling activities such as storage piles, conveyors, and vehicle traffic.*" Compl. Ex. B, at 1 (emphasis added). With reports of stockpiling and of "trucks and equipment going back and forth on the property," Second Hamilton Decl. ¶ 4, and the permit's broad language, a question certainly arises as to whether Defendant's associated activities are truly independent or whether they are related to its batching operation and fall under the permit's restrictions, thereby rendering Defendant's failure to obtain local land use approval prior to engaging in them "a technical violation of [D]efendant's [ACD] Permit requiring such approvals." Def.'s Br. in Supp. of Its Mot. for Summ. J., at 1-2.

Moreover, if Defendant's associated activities do in fact violate its ACD permit, then Defendant could be in violation of the CAA. Indeed, under the CAA, a defendant's violation of a state or local permit's terms or conditions issued pursuant to a SIP constitutes a violation of an emission standard or limitation, thus allowing private citizens to initiate judicial proceedings against the defendant "who is alleged to have violated . . . or to be in violation of . . . [the] emission standard or limitation." 42 U.S.C. §§ 7604(a)(1), (f)(4). The ACD permit is issued pursuant to Oregon's SIP. *See* OAR § 340-216-0020 ("No person may construct, install, establish, develop or operate any air contaminant source . . . without first obtaining an [ACD permit] from DEQ"). Thus, if Defendant is in violation of its permit, a genuine dispute of material fact exists as to Plaintiff's claim that Defendant's associated activities violate the CAA, and the Court must therefore deny Defendant's motion for summary judgment on this issue.

/ / /

/ / /

## CONCLUSION

For the reasons discussed, Plaintiff's claim for declaratory relief, injunctive relief, and civil penalties with regards to Defendant's allegedly wrongful operation of its asphalt batch plant are moot, thus necessitating summary judgment in Defendant's favor. However, a genuine issue exists with regards to Plaintiff's claim that Defendant's ongoing associated activities violate the CAA, and the Court must therefore deny Defendant's motion for summary judgment on this issue. Accordingly, Defendant's motion for summary judgment (#82) is granted in part and denied in part. Plaintiff's cross-motion for partial summary judgment (#89) is denied for the same reasons Defendant's summary judgment motion is granted in part.

## ORDER

For the foregoing reasons, Defendant's motion for summary judgment (#82) is GRANTED in part and DENIED in part. Plaintiff's cross-motion for summary judgment (#89) is DENIED.

It is so ORDERED and DATED this _____ 15 _____ day of November, 2016.

MARK D. CLARKE
United States Magistrate Judge